**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| PEDRO JULIO BURGOS-GONZÁLEZ,<br>Plaintiff,<br><br>v.<br><br>FRESENIUS KIDNEY CARE OF<br>AGUADILLA, et al.,<br>Defendants. | Civil No. 25-1472 (ADC-HRV) |

## MOTION TO DISMISS

**TO THE HONORABLE COURT:**

**COMES NOW** codefendant Dr. Dionisio Acosta ("Dr. Acosta"), through the undersigned counsel, and respectfully states and prays as follows:

## I. INTRODUCTION

Plaintiff Pedro Julio Burgos-González sues more than thirty defendants in a seven-count first amended complaint (ECF No. 57) (the "Complaint" or "Compl."). Because the Complaint numbers paragraphs 162 through 168 twice, once in Counts IV and V, and again in Count VII and the sections that follow it, this motion cites each of those paragraph numbers by its first appearance only. By Plaintiff's own description, the case "concerns a physician-driven campaign intentionally orchestrated by Dr. Jaime Da Silva Arocho ('Dr. Da Silva') to deny Mr. Burgos, a Medicare patient, life-sustaining dialysis care." (Compl. ¶ 2). Plaintiff attributes the alleged retaliatory motive, the pre-discharge warnings, and the alleged dissemination of adverse information about

him to Dr. Da Silva and to Fresenius Aguadilla's Clinical Director, Leticia González. (Compl. ¶¶ 5, 69, 87, 94, 171).

Dr. Acosta, a nephrologist, is not alleged to have made or participated in the discharge decision, to have communicated with any other provider about Plaintiff, or even to have been Plaintiff's treating nephrologist. The Complaint mentions him by name in seven paragraphs (Compl. ¶¶ 35, 56, 63, 73, 76, 79, 93), which allege, at most, that he "knew" certain general medical facts; that a request made to "Fresenius personnel and Dr. Dionisio Acosta" to address a catheter was "ignored"; and that he, one of six physicians and two entities named in the same sentence, "directly declined to provide or approve stable outpatient services" on unspecified occasions. No federal claim is pleaded against him. Only two Puerto Rico-law counts reach him, and they do so solely through the collective labels "Fresenius Defendants" (Count V) and "Healthcare Defendants" (Count VI).

Those counts do not state a claim against Dr. Acosta. "[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant." *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 594 (1st Cir. 2011). Rule 8 does not permit a plaintiff to draw a defendant into a claim of intentional retaliation by placing his name in a defined group and adding the word "conspired," and it does not permit a negligence claim against a physician who is not alleged to have treated the plaintiff, to have breached any identified standard of care, or to have caused any identified harm. Measured against that standard, the Complaint's seven passing references to Dr. Acosta, set out in full in Part II.B below, do not come close to pleading a plausible claim against him. Dr. Acosta therefore respectfully requests that the Court dismiss the claims against him under Fed. R. Civ. P. 12(b)(6).

## II. THE ALLEGATIONS

### A. The Complaint's Narrative Centers on Other Defendants

Plaintiff, who is forty-six, has end-stage renal disease and lupus and requires hemodialysis every other day. (Compl. ¶¶ 2, 60). He received outpatient dialysis at Fresenius Aguadilla. (Compl. ¶ 3). According to Plaintiff, Dr. Da Silva "was a nephrologist working for the Fresenius Isabela and Aguadilla clinics," and his relationship with Plaintiff "began to deteriorate" after Plaintiff questioned one of his diagnoses. (Compl. ¶ 4). In 2024, Plaintiff complained to Medicare and Medicaid about conditions at Fresenius Aguadilla and wrote to a senior Fresenius executive. (Compl. ¶¶ 5-6, 64-65). In December 2024, a Fresenius nurse allegedly told Plaintiff that, "on instructions from Dr. Da Silva and Leticia González, the facility intended to cancel his services in retaliation for his contacts with Medicare and Medicaid." (Compl. ¶ 69).

After a March 17, 2025 confrontation with a social worker, Fresenius Aguadilla issued a March 19, 2025 notice of involuntary discharge. (Compl. ¶¶ 7, 77-81). Plaintiff alleges that Defendants used the March 17 event "as a pretext or convenient label for a decision driven by Dr. Da Silva's hostility and retaliation for Mr. Burgos's grievances." (Compl. ¶ 87). He then alleges that physicians and facilities across Puerto Rico declined to accept him (Compl. ¶¶ 88-93), and asks the Court to infer "that Dr. Da Silva or persons acting with him disseminated an adverse characterization of Mr. Burgos as 'problematic' or unacceptable." (Compl. ¶ 94).

Plaintiff acknowledges the limits of what he knows. He does not "know the full extent of Dr. Da Silva's communications with the other Defendants seeking to exclude him from dialysis clinics" (Compl. ¶ 4); he "is unaware which parties and/or entities have conspired to deny him essential medical services" (Compl. ¶ 26 n.3); and "[t]he exact communications, who made them, to whom, when, and what was said, are within Defendants' records and knowledge" (Compl. ¶ 95). Plaintiff's own catalogue of the facts said to support an inference of intentional conduct, his 2024

grievances, the nurse's warning, the March 2025 discharge, and the receiving facilities' repeated refusals, does not mention Dr. Acosta. (Compl. ¶ 171).

## B. The Paragraphs That Mention Dr. Acosta

Of the Complaint's 190 numbered paragraphs (183 numbers, seven of them (¶¶162–168) used twice) Dr. Acosta is named in just seven. In the Complaint's own words:

(a) **¶ 35.** "Upon information and belief, he is a physician for Fresenius Aguadilla, Mayaguez and San German," "also a physician at Atlantis of Aguadilla and Nefrólogos Asociados del Oeste," who "covers various hospitals on the West Coast."

(b) **¶ 56.** He is one of thirteen named individuals and entities, plus unnamed Doe defendants, defined as the "Fresenius Defendants," who "have jointly and severally conspired and orchestrated a campaign to deny Mr. Burgos outpatient dialysis care at their clinics and cause other doctors or clinics outside their medical system to also deny him dialysis treatment medically necessary to sustain his life." Nonetheless, in conflict with his own allegation, Plaintiff admits that he does not know who did this, as he "is unaware which parties and/or entities have conspired to deny him essential medical services" (Compl. ¶ 26 n.3).

(c) **¶ 63.** He, Ms. González, Dr. Pagán, "and the facility's nursing and social-work personnel knew that interruption of treatment or discharge without an actual receiving facility could cause toxic accumulation, infection, hospitalization, organ injury, or death."

(d) **¶ 73.** "Mr. Burgos repeatedly asked Fresenius personnel and Dr. Dionisio Acosta to address the catheter. He alleges that his requests were ignored for approximately two (2) to three (3) weeks. An associate physician ultimately referred him to Western Vascular in Mayagüez, where the catheter was replaced." The next paragraph adds that "[t]hroughout that time, Mr. Burgos went without effective dialysis, worsening his condition the final thirteen (13) days causing him to develop contaminated blood or a bloodstream infection." (¶ 74).

(e) **¶ 76.** After stating that Plaintiff "had to undergo that procedure due to Fresenius Aguadilla's negligence in treating him," the Complaint states: "Note that Dr. Da Silva and Dr. Dionisio Acosta had note." (sic).

(f) **¶ 79.** "Dr. Da Silva, Dr. Dionisio Acosta, Mrs. Leticia González and other Fresenius Aguadilla staff all knew that such patients suffer from depression and anxiety… However, in Mr. Burgos' case, said personnel sought to push him to his limits."

(g) **¶ 93.** "[N]o temporary placement lasted more than approximately eighteen (18) days and… Dr. Dionisio Acosta, Dr. Elvin Soto-Hernández, Dr. Da Silva, Dr. Angel F. Delgado-Garrastegui, Dr. Albrto E. Arévalo-Roig, Dr. Cesar Rivera-Reverón (Nephrologist), Atlantis, and Nefrólogos Asociados del Oeste each directly declined to provide or approve stable outpatient services."

By contrast, where Plaintiff means to allege that a particular physician did something specific, he says so: the physician who allegedly said "[l]et him die because he called the FBI on Dr. Da Silva" (Compl. ¶ 91); the nephrologist who allegedly told him to go to the continental United States (Compl. ¶ 99); the medical director who "declined to approve Mr. Burgos" at Atlantis of Lares (Compl. ¶¶ 110-111); and the physicians who allegedly refused emergency admission on March 9, 2026 (Compl. ¶ 114). Dr. Acosta is not among them.

### C. The Counts and the Defendants They Target

Count I (ADA Title III) is directed at the "Private Facility Defendants", Fresenius Aguadilla, Atlantis, Hospital Susoni, Nefrólogos Asociados del Oeste, and "any Doe entity that owns, leases, or operates a private place of public accommodation." (Compl. ¶ 57). Counts II and III (Rehabilitation Act § 504 and Affordable Care Act § 1557) are directed at the "Federally Funded Entity Defendants" and "Covered Health Program Defendants," described as "institutional defendants." (Compl. ¶ 58). Count IV (ADA retaliation) is directed at Hospital Susoni and unnamed "Responsible Doe Defendants." Count VII (vicarious liability) is directed at the "Institutional Defendants," a term the Complaint never defines. Dr. Acosta is not named in the heading of any count. He is drawn into Count V only through ¶ 56's definition of "Fresenius Defendants," and into Count VI only through ¶ 59's definition of "Healthcare Defendants" "the persons and entities that participated in Mr. Burgos's treatment, discharge, communications, referral, record transfer, admission, case management, or emergency-care decisions." (Compl. ¶¶ 56, 59).

## III. LEGAL STANDARD

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The tenet that a court must accept a complaint's allegations as true "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679.

The First Circuit follows a two-step approach. "Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible," and the "combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quoting *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)). "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Id.*

That standard applies with particular force here. A complaint naming more than thirty defendants does not satisfy Rule 8 by alleging that "the defendants" collectively did something; it must give each defendant fair notice of what he, specifically, is alleged to have done. "[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant." *Peñalbert-Rosa*, 631 F.3d at 594. As shown below, the Complaint does not meet that standard as to Dr. Acosta.

## IV. ARGUMENT

### A. The Complaint Pleads No Federal Claim Against Dr. Acosta

Counts I through IV, the Complaint's federal claims, are directed at facilities, institutional defendants, and Hospital Susoni, not at individual physicians. (Compl. ¶¶ 57-58 & Counts I-IV). Count VII, for vicarious liability, is directed at the "Institutional Defendants." Nothing in the Complaint purports to assert an ADA, Rehabilitation Act, or Affordable Care Act claim against Dr. Acosta, and the Court should not read into the Complaint a claim that Plaintiff, who is represented by court-appointed counsel, chose not to plead. The only claims that reach Dr. Acosta are Counts V and VI, which purportedly arise under Puerto Rico law.

### B. Counts V and VI Require Facts Showing an Act or Omission by Dr. Acosta, Causation, and, for Count VI, a Duty Owed to Plaintiff

Counts V and VI are pleaded under Article 1536 of the 2020 Puerto Rico Civil Code, which the Complaint describes as requiring "a person who, through fault or negligence, causes damage to another to repair that damage." (Compl. ¶ 168; see also Count VI heading). Puerto Rico's courts have explained that Article 1536 imposes tort liability on a person who by an act or omission causes damage to another through fault or negligence, as did its predecessor, Article 1802 of the former Civil Code, 31 L.P.R.A. § 5141. Under the case law interpreting Article 1802, a negligence claim requires "(1) evidence of physical or emotional injury, (2) a negligent or intentional act or

omission (the breach of duty element), and (3) a sufficient causal nexus between the injury and defendant's act or omission (in other words, proximate cause)." *Vázquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 49 (1st Cir. 2007). Moreover, "foreseeability is a central issue… , as it is an element of both breach of duty and proximate cause," and "the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." *Id.*

Count VI, which asserts "professional negligence," additionally requires facts showing "(1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 167 (1st Cir. 2005). In the medical-malpractice context specifically, that duty is to "offer [the] patient that medical care, attention, skill, and protection that, in the light of the modern means of communication and education, and pursuant to the current status of scientific knowledge and medical practice, meets the professional requirements generally acknowledged by the medical profession." *Pagés-Ramírez v. Ramírez-González*, 605 F.3d 109, 113 (1st Cir. 2010). The duty also arises, more generally, from the relationship between physician and patient. *See Martínez Marrero v. González Droz*, 180 D.P.R. 579 (P.R. Jan. 11, 2011) (explaining that, as with a physician's civil liability generally, the doctrine of informed consent has extracontractual origins and is "simply a function of the legal duty that emanates from the physician-patient relationship, whether or not that relationship is based on a contract").

As shown in Parts IV.C and IV.D below, the Complaint satisfies none of these requirements as to Dr. Acosta. It pleads no act or omission attributable to him individually, no duty arising from any of the recognized sources, and no causal nexus between anything he is alleged to have done and Plaintiff's injuries.

### C. Count V Does Not State a Plausible Claim Against Dr. Acosta

#### *1. The Complaint Assigns the Alleged Retaliation to Others.*

Count V alleges retaliatory discharge and intentional interference with medical relationships. The conduct on which it rests is that the named groups "intentionally or recklessly caused Mr. Burgos's immediate discharge, used his contacts with Medicare and Medicaid as purported 'incidents,' and transmitted or encouraged the transmission of adverse information calculated to prevent other providers from accepting him." (Compl. ¶ 170). Every purported fact the Complaint pleads about who did these things points to someone other than Dr. Acosta. The alleged discharge was issued by Fresenius Aguadilla (Compl. ¶¶ 7, 81); the instructions to cancel Plaintiff's services allegedly came from "Dr. Da Silva and Leticia González" (Compl. ¶ 69); the decision was purportedly "driven by Dr. Da Silva's hostility" (Compl. ¶ 87); and the dissemination of adverse information is attributed to "Dr. Da Silva or persons acting with him" (Compl. ¶ 94). As shown above, Plaintiff's own catalogue of facts supporting an inference of intent (Compl. ¶ 171) never mentions Dr. Acosta.

The Complaint does not allege that Dr. Acosta knew of Plaintiff's complaints to Medicare and Medicaid; that he signed or approved the discharge; that he held the "medical director" or "attending physician" role that, according to the Complaint, the governing regulation assigns to the behavior-based discharge process (Compl. ¶¶ 38, 84-85, 106); or that he spoke to any other provider about Plaintiff. The Complaint therefore supplies no facts from which the Court could "draw the reasonable inference that [Dr. Acosta] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### *2. Dr. Acosta Is Joined to Count V Only Through a Collective Label.*

Dr. Acosta is joined to Count V because ¶ 56 places him in a defined group of "Fresenius Defendants" alleged to have "jointly and severally conspired and orchestrated a campaign." That does not suffice. The First Circuit confronted a materially identical pleading strategy in *Peñalbert-Rosa*, where the plaintiff alleged that three named defendants "conspired" to fire her for political reasons but pleaded no fact showing that any particular one of them actually participated in that decision. 631 F.3d at 594. The court held the complaint inadequate as to each named defendant, explaining that "there is nothing in the complaint beyond raw speculation to suggest that the named defendants participated—either as perpetrators or accomplices—in the decision" complained of. *Id.* at 594-95. The court added that a plaintiff with any non-speculative basis for the charge would almost certainly have said so: "[s]pecific information, even if not in the form of admissible evidence, would likely be enough at this stage; pure speculation is not." *Id.* at 596. The Complaint's treatment of Dr. Acosta suffers from the identical defect. An adequate complaint "must provide fair notice to the defendants," *Ocasio-Hernández*, 640 F.3d at 12, and "the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally." *Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 68 (1st Cir. 2004). The Complaint pleads none of the "who did what… when, where" as to Dr. Acosta in Count V. Nor does the latitude to plead state of mind generally excuse that omission: Rule 9 "does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87.

The Supreme Court's treatment of a similarly undifferentiated pleading in *Twombly* is instructive. There, the complaint "furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place," so that "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would

have little idea where to begin." 550 U.S. at 565 n.10. The Complaint does not say which of the thirteen named "Fresenius Defendants," or which of their unnamed affiliates, did what, when, or to whom. Its allegations against Dr. Acosta in Count V are of that kind.

### *3. The Conclusory "Conspiracy" Allegation and the "Information and Belief" Inferences Add Nothing.*

Plaintiff's label that the "Fresenius Defendants" "jointly and severally conspired" does not fill the gap. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. The First Circuit drew the same line in *DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53 (1st Cir. 1999), distinguishing between a complaint that alleges "facts indicating an agreement" and one "merely asserting a conspiracy in conclusory terms." *Id.* at 57 (emphasis omitted); *see also id.* at 55 (a plaintiff's facts must be accepted as alleged, but "this does not automatically extend to '[b]ald assertions, subjective characterizations and legal conclusions'") (citation omitted). Plaintiff pleads no fact, no meeting, communication, agreement, or act linking Dr. Acosta to any agreement. To the contrary, Plaintiff concedes that he does not know which parties conspired (Compl. ¶ 26 n.3), and that the "exact communications—who made them, to whom, when, and what was said" are unknown to him (Compl. ¶ 95).

That the alleged communications by "Dr. Da Silva or persons acting with him" are pleaded "on information and belief" (Compl. ¶¶ 94-95) does not help Plaintiff as to Dr. Acosta. Where an allegation is made on information and belief, "if he had any facts to support this assertion, they should have been set forth. 'Information and belief' does not mean pure speculation." *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012). As *Peñalbert-Rosa* recognized in the closely analogous setting of an undifferentiated conspiracy charge against named individual defendants, if Plaintiff had any basis beyond speculation for charging Dr. Acosta specifically with knowing

participation in Dr. Da Silva's purported campaign, "it seems almost certain that this would have been mentioned—if not in the complaint at least in the opposition to [this] motion to dismiss." 631 F.3d at 596. The Complaint does not identify a single fact suggesting that Dr. Acosta was among the "persons acting with" Dr. Da Silva.

#### 4. *The Remaining References to Dr. Acosta Do Not State a Claim of Retaliation or Interference.*

Paragraphs 63 and 79 allege that Dr. Acosta and others "knew" that interrupting dialysis or discharging a patient without a receiving facility could cause serious harm, and that terminally ill patients suffer depression and anxiety. General medical knowledge attributed to a group is not an act by Dr. Acosta, much less one taken in retaliation for Plaintiff's complaints. And the assertion that "said personnel sought to push him to his limits" (Compl. ¶ 79) is a characterization, not a fact; it is the kind of "subjective characterization[]" that a court sets aside at step one. *DM Research*, 170 F.3d at 55.

Paragraph 93 alleges that Dr. Acosta, five other physicians, and two entities "each directly declined to provide or approve stable outpatient services." The allegation is unaccompanied by any fact, when, where, in response to what request, on what stated ground, or with what authority to admit Plaintiff anywhere. It is, at most, "merely consistent with" liability, and so "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557) (brackets omitted). The Complaint itself pleads that admission at one network facility "depended on the discretion of its medical director" (Compl. ¶ 110) underscoring that a refusal is a decision by a particular person at a particular facility, which is precisely the detail the Complaint supplies for other physicians (Compl. ¶¶ 91, 99, 111, 114) and omits for Dr. Acosta. Nor does the Complaint connect any refusal by Dr. Acosta to Plaintiff's protected complaints or to the discharge that Count V challenges.

### 5. *The Complaint Does Not Plead a Contract With Which Dr. Acosta Interfered.*

Count V's caption characterizes part of its theory as "intentional interference with medical relationships." (Compl., Count V heading). To the extent that language invokes Puerto Rico's tort of interference with a contractual relationship, the claim fares no better against Dr. Acosta. Puerto Rico's general tort statute "allows… the action for tortious interference with the contractual relations of third persons," but only on proof of four elements, the first of which is that "there must be a contract with which a third person interferes. If what is affected is an exception or a profitable financial relationship where there is no contract, the action does not lie, although it is possible that liability be incurred under other judicial principles." *General Office Prods. Corp. v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077, 1081 (1st Cir. 1986) (applying Puerto Rico law). The second element requires "fault," which the court of appeals equated with "knowledge of the contract's existence." *Id.*

The Complaint does not identify any contract between Plaintiff and another dialysis provider that Dr. Acosta allegedly knew of or induced a breach of, nor any specific prospective contractual relationship that he intentionally disrupted. It alleges, in the same collective terms already addressed above, only that several physicians "directly declined to provide or approve stable outpatient services." (Compl. ¶ 93). That allegation identifies no contract, no knowledge of a contract, and no fault specific to Dr. Acosta, and so cannot support a tortious-interference theory any more than it supports the retaliation theory addressed above.

## D. Count VI Does Not State a Plausible Claim Against Dr. Acosta

### 1. *The Complaint Pleads No Duty Running From Dr. Acosta to Plaintiff.*

Count VI is pleaded against the "Healthcare Defendants" collectively. The duty it asserts is likewise collective: the "Healthcare Defendants owed Mr. Burgos duties arising from the

applicable professional standard of care, their treatment and referral relationships, their control over records and placement decisions, and the ordinary duty to act reasonably under circumstances in which delay could be fatal." (Compl. ¶ 176). That is a legal conclusion. It does not identify what duty Dr. Acosta owed Plaintiff or why. The Complaint nowhere alleges that Dr. Acosta was Plaintiff's treating physician, attending physician, or medical director. It identifies Dr. Da Silva as the nephrologist with whom Plaintiff dealt (Compl. ¶¶ 4, 62), and describes Dr. Acosta only as a physician who works at various clinics and "covers various hospitals" (Compl. ¶ 35). Without facts establishing a physician-patient relationship out of which a duty arose the allegation that Dr. Acosta "declined to provide or approve stable outpatient services" (Compl. ¶ 93) does not describe the breach of any duty owed to Plaintiff.

The regulations Plaintiff invokes "as evidence of duty and breach" (Compl. ¶ 177) do not fill the gap. The Complaint describes the behavior-based discharge regulation as requiring, among other things, "signatures from the medical director and attending physician" (Compl. ¶ 85); it identifies Dr. Pagán, not Dr. Acosta, as the medical director (Compl. ¶¶ 38, 106); and it does not allege that Dr. Acosta was Plaintiff's attending physician.

Nor does the Complaint bring Dr. Acosta within any of the sources from which a duty may otherwise arise. *See* Part IV.B, *supra*. It does not allege that he held any administrative, supervisory, or directorial position at Fresenius Aguadilla or any other facility; that any statute, regulation, contract, or custom assigned him responsibility for the dialysis unit, the catheter program, or Plaintiff's placement; or that he had authority to direct any other provider's conduct. It alleges only that he was "a physician for Fresenius Aguadilla, Mayaguez and San German," "also a physician at Atlantis of Aguadilla and Nefrólogos Asociados del Oeste," who "covers

various hospitals on the West Coast." (Compl. ¶ 35). A treating or covering physician is not, without more, a medical director or supervisor, and the Complaint does not bridge that gap.

### ***2. The Breaches Alleged Are Pleaded Collectively and Largely Concern Others.***

The breaches alleged in ¶¶ 179-182 are attributed to all "Healthcare Defendants" at once, and many concern events that, on the Complaint's own account, involved others. The conversation about vascular access that Plaintiff characterizes as coercive was with a social worker. (Compl. ¶¶ 77, 179). The discharge notice was issued by Fresenius Aguadilla. (Compl. ¶¶ 81, 86). And the March 2026 events at Hospital Susoni delayed hemodialysis, a delayed oxygen order, management of anemia, and withheld placement records concern that hospital and "the responsible physicians and personnel" (Compl. ¶ 180); the Complaint names other physicians in connection with them (Compl. ¶¶ 114, 122) and does not allege that Dr. Acosta had any role. Such group allegations are the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the Court must set aside. *Iqbal*, 556 U.S. at 678.

### ***3. Paragraph 73 Does Not State a Claim of Malpractice Against Dr. Acosta.***

The only allegation directed at Dr. Acosta's purported clinical conduct is ¶ 73: Plaintiff "repeatedly asked Fresenius personnel and Dr. Dionisio Acosta to address the catheter," "his requests were ignored for approximately two (2) to three (3) weeks," and "[a]n associate physician ultimately referred him to Western Vascular in Mayagüez, where the catheter was replaced." Even read generously, that allegation does not plausibly state malpractice against Dr. Acosta, for four reasons.

*First*, it does not say who ignored what. The request was allegedly made to "Fresenius personnel and Dr. Dionisio Acosta" together, and the next clause is in the passive voice: "his requests were ignored." The Complaint does not allege when Plaintiff spoke to Dr. Acosta, how,

or what he said; what Dr. Acosta was in a position to do; or that Dr. Acosta, as opposed to the facility's nursing staff or another physician, received or was responsible for the request. That is the absence of "who did what to whom, when, where." *Educadores*, 367 F.3d at 68.

*Second*, it pleads no standard of care and no breach. Plaintiff must allege facts showing that "the duty owed" was transgressed by "an act or omission." *Marcano Rivera*, 415 F.3d at 167. The Complaint does not allege what a nephrologist in Dr. Acosta's position was required to do about a malfunctioning catheter, or what he failed to do, beyond the conclusion that requests were "ignored."

*Third*, it pleads no causal nexus. The Complaint attributes the need for the second catheter procedure to "Fresenius Aguadilla's negligence in treating him" (Compl. ¶ 76), not to any act of Dr. Acosta. Paragraph 74 attributes the loss of effective dialysis and the alleged bloodstream infection to what happened "[t]hroughout that time," without alleging what Dr. Acosta did or failed to do during that period, or how any such act or omission, as opposed to the catheter malfunction and the "facility's reported dialysis-adequacy readings" (Compl. ¶ 72) proximately caused the infection. A "sufficient causal nexus between the breach and the harm," *Marcano Rivera*, 415 F.3d at 167, must be pleaded with facts that permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

*Fourth*, the sentence that follows "Note that Dr. Da Silva and Dr. Dionisio Acosta had note" (Compl. ¶ 76) (sic) is unintelligible as written. If it is meant to say that they "had notice" of the catheter problem, notice alone is neither breach nor causation, and Rule 8's requirement of "fair notice to the defendants," *Ocasio-Hernández*, 640 F.3d at 12, is not met by an allegation whose meaning the reader must guess. The remaining allegations that Dr. Acosta "knew" that interrupting treatment could be dangerous (Compl. ¶ 63), and that terminally ill patients suffer

depression and anxiety (Compl. ¶ 79) describe general knowledge, not an act or omission that breached a duty to Plaintiff or caused him harm.

## V. CONCLUSION

Labels cannot substitute facts, and that is all the Complaint offers against Dr. Acosta. Of the Complaint's seven counts, five are pleaded against defined groups of corporate and institutional entities, not against Dr. Acosta. The remaining, Counts V and VI, reach him only by placing his name on a list of more than thirty defendants and in seven passing references that, as set forth above, describe nothing more than general medical knowledge he is said to share with others and an unspecified refusal shared with seven other physicians and entities to "provide or approve stable outpatient services." None of those seven references attributes a specific act, omission, or decision to Dr. Acosta individually; each lumps him together with five to seven co-defendants under a single undifferentiated label, without a single fact as to what he, as opposed to any of the others, did, said, or decided. That is precisely the kind of undifferentiated group pleading the law does not permit.

What the Complaint never supplies, it cannot supply by repetition, inference, or group pleading, least of all the label "conspired." As discussed above, Plaintiff himself concedes he cannot support that label as he admits he is unaware which parties and/or entities have conspired to deny him essential medical services.

**WHEREFORE**, Dr. Acosta respectfully requests that the Court dismiss the Complaint against him pursuant to Fed. R. Civ. P. 12(b)(6), and grant such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY**: That on today's date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends notice to all attorneys of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 21st day of October, 2026.

**Capó Iriarte Law**

S/José Capó Iriarte
USDC No. 227901
P.O Box 360535
San Juan, PR 00936
787-410-4317
capo@capoiriarte.com